**In re CLASSIC DRYWALL, INC.,**
**a/k/a Hutchinson Drywall,**
**Debtor.**

**J. Michael MORRIS, Trustee, Plaintiff,**

v.

**KANSAS DRYWALL SUPPLY**
**COMPANY, INC. and Pioneer**
**Materials, Inc., Defendants.**

**Bankruptcy No. 88–11204.**
**Adv. No. 88–0256.**
**No. 89–1444.**

United States District Court,
D. Kansas.

Oct. 25, 1990.

Stanley R. Juhnke, Hutchinson, Kan., for plaintiff.

Charles F. Harris, Kaplan, McMillan & Harris, Mark J. Lazzo, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on appeal of the bankruptcy court's journal entry of judgment filed August 3, 1989, in the adversary proceeding. For the reasons stated from the bench, the bankruptcy court held that the debtor's payments to the defendant Kansas Drywall Supply Company, Inc. (Kansas Drywall), totalling $6,158.98, were preferential transfers recoverable by the trustee and "were not made according to ordinary business terms" so as to qualify under that exception, 11 U.S.C. § 547(c)(2). In its appeal, Kansas Drywall contends the bankruptcy court ignored the uncontroverted evidence that the debtor's payments were in accordance with the past practice of the parties and the common practice of the industry. Kansas Drywall also argues the interpretation of § 547(c)(2) used by the bankruptcy court is unduly narrow, is not consistent with the rule followed by a majority of the courts, and contradicts legislative intent.

A preference action is brought in an effort to prevent one creditor from being treated better than the other creditors. *In re Magic Circle Energy Corp.*, 64 B.R. 269, 275 (Bankr.W.D.Okla.1986). The overriding goal of the voidable preference provisions is to ensure fair or equal treatment of creditors. *Matter of Xonics Imaging Inc.*, 837 F.2d 763, 765 (7th Cir.1988). The trustee in bankruptcy has the option under 11 U.S.C. § 547(b) to void transfers that the debtor made on or within ninety days before the filing of the bankruptcy petition while insolvent in payment of an ante-

cedent debt. The trustee may not void a transfer which qualifies under the exception for an ordinary business transaction, 11 U.S.C. § 547(c)(2). *Fidelity Sav. & Inv. Co. v. New Hope Baptist*, 880 F.2d 1172, 1177 (10th Cir.1989). This section provides:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

This section is the principal provision at work in this case.

On appeal, the bankruptcy court's findings of fact are accepted unless clearly erroneous and its determinations of law are reviewed *de novo*. *In re Branding Iron Motel, Inc.*, 798 F.2d 396, 399–400 (10th Cir.1986). Whether a payment is made in the ordinary course of business and in accordance with ordinary business terms is a uniquely factual decision subject to review on a clearly erroneous standard. *In re Yurika Foods Corp.*, 888 F.2d 42, 45 (6th Cir.1989). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The interpretation of § 547(c)(2) is a matter of law. *Fidelity Sav. & Inv. Co.*, 880 F.2d at 1174. A bankruptcy court's findings are reviewed for plain error when based upon a misunderstanding of the law. *In re Fulghum Const. Corp.*, 872 F.2d 739, 742 (6th Cir.1989).

Since the only evidence presented to the bankruptcy court was the parties' stipulations and the defendants' submission of one affidavit and the testimony of one other witness, the critical facts are uncontested. The defendant Kansas Drywall is in the

business of selling drywall supplies. Before it filed for bankruptcy, the debtor Classic Drywall, Inc., a/k/a Hutchinson Drywall (Classic Drywall), had purchased drywall supplies from Kansas Drywall on open account for approximately ten years. For seven of those years, the debtor was Kansas Drywall's largest volume customer.

The longstanding billing practice of Kansas Drywall was to bill all invoices shipped during the previous month on the twenty-fifth day of the month. The terms stated on the billing statements were "discount 2% by the 10th, net on the 20th." The billing statements sent the debtor for the three months within the preference period and the two prior months reflect the following account activity:

December 1987
| | | |
|---|---|---|
| Account Balance | $6,564.72 | |
| | | (60–days old $2,599.48) |
| | | (30–days old $ 326.71) |
| Prior Balance | $2,926.19 | |
| Additional Sales | $3,638.53 | |
| Payments | $ –0– | |
| Credits | $ –0– | |

January 1988
| | | |
|---|---|---|
| Account Balance | $7,850.30 | |
| | | (90–days old $2,599.48) |
| | | (60–days old $ 326.71) |
| | | (30–days old $3,638.53) |
| Prior Balance | $6,564.72 | |
| Additional Sales | $1,285.58 | |
| Payments | $ –0– | |
| Credits | $ –0– | |

February 1988
| | | |
|---|---|---|
| Account Balance | $5,648.55 | |
| | | (60–days old $3,638.53) |
| | | (30–days old $1,285.58) |
| Prior Balance | $7,850.30 | |
| Additional Sales | $ 724.44 | |
| Payments | $2,903.53 | (2/25/88—Ck. # 4544) |
| Credits | $ 22.66 | |

March 1988
| | | |
|---|---|---|
| Account Balance | $5,679.65 | |
| | | (90–days old $2,718.60) |
| | | (60–days old $1,285.58) |
| | | (30–days old $ 599.16) |
| Prior Balance | $5,648.55 | |
| Additional Sales | $1,076.31 | |
| Payments | $ 911.57 | (3/11/88—Ck. # 4571) |
| Credits | $ 8.36 | |

April 1988
| | | |
|---|---|---|
| Account Balance | $3,217.96 | |
| | | (120–days old $ 166.71) |
| | | (90–days old $1,285.58) |
| | | (60–days old $ 724.44) |
| | | (30–days old $ 951.03) |
| Prior Balance | $5,679.65 | |
| Additional Sales | $ 90.20 | |
| Payments | $ 194.75 | (4/14/88—Ck. # 4627) |
| | $2,346.43 | (4/14/88—Ck. # 4628) |
| Credits | $ 10.71 | |

The highlighted payments are those alleged by the trustee and found by the bankruptcy court to be avoidable preferential transfers. As stipulated by the parties, these disputed payments were applied to the following invoices:

| Invoice No. | Invoice Date | Date Due | Date Paid | Amount Paid | Check No. |
|---|---|---|---|---|---|
| 6721 | 12/18/87 | 01/20/88 | 03/09/88 | $ 29.00 | 4571 |
| 6752 | 12/24/87 | 01/20/88 | 03/09/88 | 354.48 | 4571 |
| 6778 | 12/31/87 | 02/20/88 | 03/09/88 | 71.21 | 4571 |
| 6764 | 12/31/87 | 02/20/88 | 03/09/88 | 177.24 | 4571 |
| 6798 | 01/12/88 | 02/20/88 | 03/09/88 | 113.43 | 4571 |
| 6844 | 01/15/88 | 02/20/88 | 03/09/88 | 5.26 | 4571 |
| 6904 | 01/25/88 | 02/20/88 | 03/09/88 | 89.76 | 4571 |
| 6692 | 12/18/87 | 01/20/88 | 04/11/88 | 975.33 | 4628 |
| 6705 | 12/18/87 | 01/20/88 | 04/11/88 | 283.58 | 4628 |
| 6737 | 12/24/87 | 01/20/88 | 04/11/88 | 668.76 | 4628 |
| 6913 | 01/25/88 | 02/20/88 | 04/11/88 | 63.09 | 4628 |
| 6943 | 01/29/88 | 03/25/88 | 04/11/88 | 75.02 | 4628 |
| 6929 | 01/29/88 | 03/25/88 | 04/11/88 | 6.59 | 4628 |
| 6927 | 01/29/88 | 03/25/88 | 04/11/88 | 19.31 | 4628 |
| 7013 | 02/11/88 | 03/25/88 | 04/11/88 | 79.00 | 4628 |
| 7002 | 02/11/88 | 03/25/88 | 04/11/88 | 61.08 | 4628 |
| 7029 | 02/17/88 | 03/25/88 | 04/11/88 | 64.46 | 4628 |
| 7115 | 02/25/88 | 12/20/87 | 04/11/88 | 118.75 | 4627 |
| Oct./Nov. Invoices | | | 02/23/88 | 2903.53 | 4544 |
| | | | | $6158.98 | |

The parties further stipulated that the payments were made while the debtor was insolvent and on account of an antecedent debt which enabled the defendant to receive more than it would have received in payment under the Chapter 7 proceedings.

On May 5, 1988, the debtor voluntarily petitioned for relief under Chapter 7 of the United States Bankruptcy Code. The appointed trustee filed his complaint against Kansas Drywall on October 13, 1988, seeking to avoid Classic Drywall's payments to Kansas Drywall totalling $6,158.98 as preferential transfers under 11 U.S.C. § 547. After hearing the testimony from the manager of Kansas Drywall, the bankruptcy court ruled from the bench, in pertinent part:

The testimony today, leads the Court to conclude that while the terms of the bills are discount 2 percent by the 10th, net on the 20th, the practice in the industry and by the defendant, in this case, was to permit a good customer to, essentially, ignore the terms of the statement and, basically, make payments when it was able.

The question before the Court is whether this constitutes a defense within Section 547(c), which permits—or which denies the trustee to—the right to avoid a transfer if the transfer was in payment of a debt incurred by the debtor in the ordinary course of business, or financial affairs of the debtor, and the transferee made in the ordinary course of business or financial affairs of the debtor and transferee, and made according to ordinary business terms.

As I suggested earlier, Mr. Harris's and the debtor's—the defendant's interpretation of that would essentially mean that an industry could, by simply ignoring the terms of its own, avoids the im-

pact of 547. I don't believe that this is the law.

Back when the amendment was made to eliminate the 45–day rule, many of the industries, particularly wholesale industries such as Coleman, here in Wichita, were having difficulties with seasonal sales because many of them had terms in their invoices which exceeded the 45 days, and they were of the primary movers seeking the amendment to eliminate the 45–day rule. The Congress did not settle on a specific day standard, but rather left it to ordinary business terms.

The Court is persuaded that this context of ordinary business terms are those terms set out on the invoice, namely discount 2 percent by the 10th, net on the 20th. Any payment on an account of an antecedent debt within those deadlines would be—not be avoidable under Section 547 as a matter of U.C.C. law, and as Mr. Holmes testified, any forbearance beyond that point becomes a matter of discretion by the creditor, and becomes an impossible vague standard for the Court to conclude is within the ordinary course of business. The fact everybody is doing it, of course, is not a valid argument. The creditors, in these situations, have many methods of protecting themselves, including longer terms and perfecting their lien rights, which they have every right to do. The fact that that may be somewhat difficult under the circumstances, or in the ordinary business practice, does not mean, however, that the Court can accept an argument that would simply gut Section 547.

The Court, therefore, concludes that the trustee is entitled to judgment for the payments as set out in paragraph 20, that the creditor has not established that this payment was according to ordinary business terms, that the ordinary business terms in this context mean the terms of the invoice or other writing, rather than the ill-defined practice in the industry, and the trustee therefore wins. (Dk. 31 at pp. 41–43). Essentially, the bankruptcy court found that the payments here were in accordance with not only the ordinary practice of the parties but with that of the wholesale drywall industry. Notwithstanding this finding, the bankruptcy court held that this practice was too vague and indefinite to be called a business term, particularly when the billing statements expressly provided terms of payment. Before tackling the issues, a legal context for their discussion must be laid.

■ Having stipulated the payments were technically preferences, the burden rested on Kansas Drywall to show they came within the ordinary business exception, 11 U.S.C. § 547(c)(2). A creditor has the burden to prove an exception to the avoidability of a transfer. 11 U.S.C. § 547(g). The three elements to the ordinary business exception are: "(1) that 'the transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee,' (2) that the transfer was 'made in the ordinary course of business or financial affairs of the debtor and the transferee,' and (3) that the transfer was 'made according to ordinary business terms.' 11 U.S.C. § 547(c)(2)." *Fidelity Sav. & Inv. Co.*, 880 F.2d at 1177. The first element is not in issue due to the parties' stipulation. In its ruling from the bench, the bankruptcy court basically found the contested payments were consistent with the defendant's practice. This finding necessarily sustains the second element leaving the third element as the sole point of contention. Both the second and third elements, nevertheless, will be discussed to show their interrelated, but distinct aspects.[1]

---

1. As two bankruptcy courts have observed, a majority of the decisions do not cleanly distinguish between elements two and three and, instead, limit their inquiry to whether the late payments were consistent with the course of dealings between the debtor and the creditor. *In re SPW Corp.*, 96 B.R. 683, 685 (Bankr.N.D.

Tex.1989); *In re Steel Improvement Co.*, 79 B.R. 681 (Bankr.E.D.Mich.1987). This court agrees with that observation and the fact that the majority approach nullifies the meaning and purpose of § 547(c)(2)(C) by interpreting it to require the same showing as § 547(c)(2)(B). This court, therefore, considers it necessary to in-

■ The Bankruptcy Code nowhere defines "ordinary course of business" or "ordinary business terms," and the legislative history on either is "sparse." *In re Fulghum Const. Corp.*, 872 F.2d 739, 743 (6th Cir.1989). Courts agree § 547(c)(2) was intended to " 'protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the Debtor and the transferee.' " *Id.* (quoting *In re Energy Co-op. Inc.*, 832 F.2d 997, 1004 (7th Cir.1987)). Section 547(c)(2) was enacted " 'to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or creditors during the debtor's slide into bankruptcy.' " *In re Energy Co-op. Inc.*, 832 F.2d at 1004 (quoting H.R.Rep. No. 95–595, 95th Cong.2d Sess. 309, 373 *reprinted in* 1978 U.S.Code Cong. & Ad.News, 5787, 5963, 6329). To give the struggling debtor a chance to rehabilitate its financial problems, the trustee has avoidance powers to deter "creditors from racing to the courthouse to dismember a failing debtor," and the exceptions to avoidance are likewise designed to encourage creditors to continue their dealings with the debtor during this difficult time. *O'Neill v. Nestle Libbys P.R., Inc.*, 729 F.2d 35, 37 (1st Cir.1984).

■ As the emphasized language in 11 U.S.C. § 547(c)(2)(B) suggests, whether the transfer was "made in the ordinary course of business or financial affairs *of the debtor and the transferee*" is a subjective determination. The relations of the debtor and the creditor are placed in a vacuum, and the transfer in question is assessed for its consistency with those relations. *In re Magic Circle Energy Corp.*, 64 B.R. 269, 272 (Bankr.W.D.Okla.1986). What is subjectively ordinary between the parties is answered from comparing and contrasting the timing, amount, manner and circumstances of the transaction against the backdrop of the parties' traditional dealings.

quire both as to whether the late payment was within ordinary course of dealing between the

*In re Yurika Foods Corp.*, 888 F.2d at 45. The transaction is scrutinized for anything unusual or different. *See In re Homes of Port Charlotte, Florida, Inc.*, 109 B.R. 489, 491 (Bankr.M.D.Fla.1990). However, if the parties' past practices do not fall within "reasonable and ascertainable boundaries" then they should not be protected. *In re SPW Corp.*, 96 B.R. at 688.

■ Whether a transfer was "made according to ordinary business terms," 11 U.S.C. § 547(c)(2)(C), is an objective determination. *In re SPW Corp.*, 96 B.R. at 687; *In re Magic Circle Energy Corp.*, 64 B.R. at 272. The court here compares and contrasts the particular transaction against the "practices" or "standards" of the industry. *In re Yurika Foods Corp.*, 888 F.2d at 45. A transaction is objectively ordinary if it does not deviate from industry norm but does conform to industry custom. In interpreting this element, one court has looked to an analogous concept in the Uniform Commercial Code, "usage of trade," which is defined as " 'any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question.' " *In re Magic Circle Energy Corp.*, 64 B.R. at 273 n. 9 (quoting Okla.Stat. tit. 12, § 1–105(1) (1981)). If an accepted or common practice of the industry, it is an "ordinary business term."

■ The classic preference situation is a lump-sum payment in response to pressure from the creditor on a long overdue obligation. *In re First Software Corp.*, 84 B.R. 278, 287 (Bankr.D.Mass.1988). The fact the payment was late does not preclude a creditor from showing it qualifies under the ordinary business exception. If the purported "late payment" was timely under the terms of the agreement as modified by the parties, then § 547(c)(2) is met assuming the late payments were in accordance with ordinary business terms.

parties and whether this course of dealing is within ordinary industry practice.

**76**

*Matter of Xonics Imaging Inc.*, 837 F.2d at 766. On the other hand, if there is no evidence the parties modified the original terms of payment, the creditor may still be able to show the "late payment" is an extra-contractual practice that is subjectively and objectively ordinary. *Id.*

The Seventh Circuit had this to say about an extra-contractual practice amounting to an ordinary business exception:

> The question for decision, therefore, is whether payments that are late in the sense of violating even the modified terms of a contract can ever be in the ordinary course of business. We hesitate to say "never." Sweeping legal generalizations made with imperfect knowledge of the factual situations that the generalizations might cover are fraught with danger. And we know that creditors frequently treat debtors leniently without intending by doing so to relax the debtors' contractual obligations (see, e.g., *Monarch Coaches, Inc. v. ITT Industrial Credit*, 818 F.2d 11, 13 (7th Cir.1987)—that is, without modifying the contract—and we do not see why in such a case the parties' "ordinary course of business" should be defined by their contract rather than by their practice. Suppose a lease required the tenant to pay on the fifteenth of each month, without any grace period, but because the nature of the tenant's business or occupation inevitably made him short of cash in the middle of the month the landlord had over a substantial period of time accepted payment on the twentieth without charging interest or threatening to evict. Then one might well conclude that payment by the twentieth, though technically in violation of the lease, was within the ordinary course of business of the parties and should be within the protection of section 547(c)(2). *It would hardly be a case within the policy of section 547(b), since it would not be a case where the tottering debtor had decided to put one creditor ahead of the others; he would simply be doing the same*

*thing he had been doing before he began to totter. And one would not want to force the case into the modification mold and hold that the lease had been modified by the parties' practice; a party should not be discouraged from exercising forbearance by the knowledge that if he does so he may be held to have surrendered a contractual right.*

*Matter of Xonics Imaging Inc.*, 837 F.2d at 767 (emphasis supplied). Though finding no evidence of an extra-contractual practice in the case before it, the Seventh Circuit recognized that § 547(c)(2) should accommodate those situations where the parties' history or course of dealings showed acceptance of late payments. "Nothing in the statute or its history indicates that late payments can never be in the ordinary course...." *Id.* at 765.

Other courts have allowed the ordinary business exception to cover late payments. Satisfied that late payments were the ordinary practice between the parties and that 82% of the creditors had not followed the credit limitations set out in the invoice, the Sixth Circuit applied § 547(c)(2). *In re Yurika Foods Corp.* 888 F.2d at 43. Because the debtor's payments on the defendants' invoices were regularly made more than 30 days late and averaged 26 to 146 days late, one court held:

> Defendant's Exhibit B establishes that the ordinary practice between the Debtor and the Defendants was for the Debtor to sporadically reduce his indebtedness by paying whatever he could afford. The Defendants accepted this course of conduct. Testimony at trial indicated that the Defendants would "work with" the Debtor, as well as other customers, whenever there was a "pattern of payment coming in." The Defendants further stated that other customers were provided with the same arrangement. Finally, the Defendants did not exert any pressure on the Debtor to satisfy his account.

*In re Matters*, 99 B.R. 314, 316 (Bankr.W. D.Va.1989). The court in *Matters* ap-

proached the issue in much the same manner used by the courts in *In re White*, 64 B.R. 843, 848 (Bankr.E.D.Tenn.1986); *In re Ferguson*, 41 B.R. 118, 121 (Bankr.E.D.Va. 1984); and *In re Mindy's, Inc.*, 17 B.R. 177 (Bankr.S.D.Ohio 1982). In these cases, the courts carefully analyzed the parties' history before the preference period and determined the average ranges for amount of payment and for time between due date and payment. The courts then accepted as ordinary any payments falling within those ranges. *See, e.g., In re Homes of Port Charlotte, Florida, Inc.*, 109 B.R. 489, 491 (Bankr.M.D.Fla.1990); *In re SPW Corp.*, 96 B.R. at 687–88. Those courts that have applied a separate industry standard element usually look to evidence of what are the typical payment periods or practices in the industry. *See, e.g., In re SPW Corp.*, 96 B.R. at 689; *In re Financial Partners, Ltd.*, 94 B.R. 537 at 539 (Bkrtcy.N.D.Ill. 1988).

 Other courts have spoken in terms that suggest reluctance to accept the notion that "late payments" can be ordinary business practice. The Eleventh Circuit has said that lateness in payment is a "particularly relevant" factor for the following reason:

> Since the foundation of this provision [547(c)(2) ] is the similarity of trade credit and current expenses, the scope of its protection is necessarily limited to trade credit which is "kept current" or other transactions which are paid in full within the initial billing cycle. Thus, untimely payments are more likely to be considered outside the ordinary course of business and avoidable as preferences.

*In re Craig Oil Co.*, 785 F.2d 1563, 1567–68 (11th Cir.1986). In a similar tone, the Seventh Circuit has labelled late payments during the preference period as "presumptively nonordinary." *Matter of Xonics Imaging Inc.*, 837 F.2d at 767. The obvious intent behind these statements is to show the relative weight of lateness as a factor.

While a payment late under the written terms of the parties' agreement is a strong indicator of a preference, this fact alone does not preclude an ordinary business exception. The framework for balancing this factor can be explained as follows:

> This court agrees that late payments, in and of themselves, indicate a trade relationship that is most often out of the ordinary; that is, not the normal financial relations the legislative history speaks to. However, if the creditor-transferee can satisfy its burden that such a practice was consistent with the parties' prior course of dealings and, to a lesser extent, was consistent with common industry practice, then the ordinary course of business exception will apply and recovery of the preferential transfer will be denied.

*In re Websco, Inc.*, 92 B.R. 1 at 3 (Bkrtcy. D.Me.1988). In other words, the fact the payment was late under the parties' contract suggests a preferential transfer, and to defeat avoidance the creditor must show that late payments similar in time and amount were within the ordinary practice of the parties and the industry.

 With this conceptual framework, the court is ready to address the two central issues on appeal of which one is a question of law and the other is one of fact. In determining what is "ordinary business terms" for purposes of § 547(c)(2), may a court properly reject industry standards and practices as being too indefinite and vague? Is the industry practice of permitting a good customer to pay as much as 120 days late in order to accommodate him under certain circumstances too vague and indefinite to constitute an "ordinary business term." As previously stated, the bankruptcy court essentially found that the payments in this case were in accordance with the ordinary practice of the parties and the industry but that the practice was too vague and indefinite to constitute an ordinary business term.

Another decision rejecting an industry standard as vague and indefinite has not been found by this court nor cited by the parties.[2] The courts have universally ac-

---

2. One commentator has observed:

> The real problem is to determine if the parties' past practice had reasonable and ascer-

cepted industry practice as the meaning of "ordinary business term." No prior published decision has added an additional policy aspect to that phrase which could be used to weed out those industry practices which do not comport with a standard of definiteness.

It is one thing to say the evidence is unpersuasive and inconclusive on what is industry norm, but it is quite another to reject the norm as incompatible with the notion that business terms should be definite. The very nature of an extra-contractual practice is that it deviates from the express terms of the parties' agreement. To this extent, an extra-contractual practice can always be called less definite and less determinable than the original written terms. The bankruptcy court's approach necessarily deprives § 547(c)(2) of its flexibility and capacity to accommodate the "ordinary" practices and customs of varied industries.

The bankruptcy court's reasoning also effectively eliminates any possibility of an extra-contractual practice being elevated into an ordinary business term. If the parties are simply acting consistent with an extra-contractual practice commonly done by them and followed in the industry, it is not a situation where the debtor has decided to favor one creditor over another. *Matter of Xonics Imaging Inc.*, 837 F.2d at 767. Stated another way, acceptance of an extra-contractual practice as an ordinary business practice and ordinary business term does not figuratively "gut" § 547; in fact, it is consistent with what has been articulated as the purposes of these provisions. "Ordinary business terms often allow payment but impose a penalty. If the drafters of the exception had intended it to

apply only to payments made on or before the due date, the requirement could easily have been made explicit." *In re White*, 64 B.R. at 850.

■ Even assuming some limit of definiteness existed in the business term element, it would not affect the industry standard shown in this case. The manager of Kansas Drywall testified it was industry practice to deviate from the stated terms on the invoice and to allow its larger customers who have been doing business with them for some time to have up to 90 to 120 days and beyond if necessary to pay their bills. The manager gave a number of reasons which explain why such a customer could be late in making payments:

> Well, the situation often arises in which our customers are involved in ongoing lengthy jobs that can stretch out for a considerable period of time. It may be difficult for them to come up with the money to pay their bill when we would like to have it. They have their own obligations to meet. Sometimes the general contractor that is paying them will be slow in paying and it can get strung out for a number of months. Also, sometimes on jobs, general contractors will hold back a retainage until several months after the job is over to make sure the job is done to their satisfaction. In doing so, they will put the subcontractor in—that was his problem job, and he will be in a pinch to pay us. Also, you will get in situations, particularly in the winter months, business gets slow, January, February, March, you get into a cold snowy winter, jobs slow down, they have a hard time getting to the stage where they can use drywall and customer will hit dead spots, therefore, they will have

---

tainable boundaries. If so, and the transfers in question fell within them, then it should be protected. However, if past conduct was so random and haphazard that it yields no reasonable, ascertainable boundaries, then the transfers should not be considered ordinary. DeSimone, *Section 547(c)(2) of the Bankruptcy Code: The Ordinary Course of Business Exception Without the 45 Day Rule*, 20 Akron Law

Review 95, 126 (1986) (quoted in *In re SPW Corp.*, 96 B.R. at 688). Presumably, the same reasoning could be applied to the ordinary business term element. A method of dealing in the industry may be accepted but occurs so irregularly and randomly that it cannot be considered an ordinary practice. The bankruptcy court here, however, did not reach this conclusion.

their money spent without paying us when they should. We have to write it off a number of times, and so will our competitors. If you want to keep that customer, keep him in business, and keep him as a customer, you will have to wait until he can generate the money.

(Dk. 31 at pp. 14–15). This testimony clearly establishes the need and circumstances justifying why suppliers of drywall accept late payments from their larger and established customers. The custom or norm for drywall suppliers was to permit late payments on accounts up to 120 days overdue, and possibly even longer, if held by customers who were regular large purchasers of drywall materials. Besides being limited by an acceptable time range, the industry practice is also defined by the type of debtor. This industry standard is not so vague or indefinite as to disqualify itself as an ordinary business term.

Based upon the bankruptcy court's findings on what was the ordinary practice of the parties and the industry, this court concludes as a matter of law that the defendant has sustained its burden of proof under § 547(c)(2).

IT IS THEREFORE ORDERED that the decision of the bankruptcy court is reversed, and the case is remanded for entry of judgment consistent with the above holdings.