In re PARKLINE CORPORATION,
Debtor.

Michael McLAUGHLIN, Trustee of
Parkline Corporation, Plaintiff,

v.

HOOLE MACHINE AND ENGRAVING
CORP., Defendant.

Bankruptcy No. 90–21168.
Adv. No. 92–2297.

United States Bankruptcy Court,
D. New Jersey.

April 18, 1994.

John J. McLaughlin and Associates by Michael McLaughlin, Millburn, NJ, for plaintiff Michael McLaughlin, Trustee.

Schiffman, Berger, Abraham & Kaufman by Paul P. Mathews, Hackensack, NJ, for defendant Hoole Mach. & Engraving Corp.

*OPINION*

ROSEMARY GAMBARDELLA,
Bankruptcy Judge.

Before this Court is the Trustee, Michael McLaughlin's (the "Trustee") Complaint against Hoole Machine and Engraving Corp. ("Hoole Machine") to avoid allegedly preferential payments totaling $19,525.90 made by the Debtor, Parkline Corporation ("Parkline") within 90 days of the filing of the Debtor's bankruptcy petition. On February 5, 1993, this Court conducted a trial on this matter. The following constitutes this Court's findings of fact and conclusions of law.

*FACTS*

On March 28, 1990, Parkline Corporation filed a voluntary petition under Chapter 11 of the Bankruptcy Code. (Transcript of February 5, 1993 hearing, hereinafter "Tr.") (Tr. 20) (P–11). The case was subsequently converted to a Chapter 7 proceeding on December 12, 1990, and a trustee, Michael McLaughlin, was appointed by the United States Trustee. Hoole Machine is a creditor of the Debtor, Parkline, on account of a pre-petition, unsecured debt listed in the Debtor's Chapter 11 petition in the scheduled amount of $26,170.00.

On April 29, 1992, the trustee filed the instant adversary proceeding against Hoole Machine to recover four payments alleged to be preferential pursuant to 11 U.S.C. § 547 and § 550. Hoole Machine, which is in the business of engraving signs in elevator cabs produced and supplied by the Debtor, filed an Amended Answer on June 22, 1992 seeking dismissal of the Complaint and asserting as an affirmative defense that the subject transfers were made according to ordinary business terms similar to other accounts that the defendant had with others in the elevator business so that the transfers cannot be avoided pursuant to 11 U.S.C. § 547(c)(2). The defendant also asserted that it gave new

value to the Debtor so that the trustee must grant the defendant a credit or set off against any preference claim pursuant to 11 U.S.C. § 547(c)(4). At trial, Hoole Machine conceded that the payments at issue were made during the preference period but contended that Parkline made the payments in the ordinary course of business. (Tr. 58–9).[1]

Mr. Heinz D. Friedrich, the sole employee and President of Hoole Machine, testified that since approximately 1981, Hoole Machine supplied Parkline with engraved signs for Parkline's elevator cabs. (Tr. 24–5). Mr. Friedrich testified that Parkline and Hoole Machine engaged in numerous business transactions in the years preceding Parkline's filing for bankruptcy. (Tr. 26–7).

Mr. Friedrich explained that once a job was completed, Hoole Machine billed its clients, including Parkline, at the end of the month. (Tr. 29). Each completed job was evidenced by an invoice. Parkline's invoices contained a net 60 days payment term, whereas other customers of Hoole Machine were on a net 30 days payment term. (Tr. 36). Parkline paid on its invoices by check, as did all of Hoole's other clients. (Tr. 30, 35–6). On some occasions, Parkline, as well as Hoole's other clients, made partial payments. (Tr. 37). In the event of partial payment, the next invoice would contain a reminder concerning past due invoices. (Tr. 31, 37).

Mr. Friedrich testified that Parkline's payments were constantly late, sometimes as much as nine months. (Tr. 29–30). At the request of his attorney, Mr. Friedrich compiled a summary of invoices from Hoole Machine to Parkline dating from January of 1986 through December of 1987, and another from February 1988 to March of 1990, detailing the varying lateness of Parkline's payments. (Tr. 27, 40) (Defendant's Exhibit, hereinafter "D") (D–2) (D–3). The first summary indicates that while the majority of payments were four months late, some were five, six or eight months late.[2] (Tr. 40) (D–

---

1. Hoole Machine's Amended Answer, ¶ 4, admits that the monies were received within ninety days prior to the commencement of Parkline's petition for bankruptcy.

2. The first summary indicates that of the 19 payments, 12, or 63%, were four months late, 2 were three months late, 1 was three and one half months late, 1 was four and one half months late, 1 was five months late, 1 was six months late and 1 was eight months late. (D–2).

2). Another creditor of Parkline confirmed the lateness of Parkline's payments. Richard Durham, the controller of Elevator Products Corporation, a company that since 1964 has manufactured elevator fixtures and does engraving on those fixtures, testified that since 1964 or 1965, Parkline was invoiced on terms net 30 days and never paid Elevator Products on time. (Tr. 53).

Lateness on payments, however, was not limited to Parkline. Hoole Machine's other clients also paid late. For instance, Regency Elevator Products Corporation for which Hoole Machine performed engraving work for six years, was always late. (Tr. 32–3). As was the case with Parkline's payments, the extent of Regency Elevator's lateness of payment was also unpredictable. A summary of invoices billed to Regency Elevator for the period of March 1988 to November 12, 1992, demonstrates the inconsistency of the timing of late payments. (D–4). In that period, one payment was overdue one month, while another was overdue fourteen months. (Tr. 32–3, 41) (D–4). Most payments, however, were four, five or seven months late.[3] (D–4).

In fact, of the six to eight companies that Mr. Friedrich does engraving for, according to his testimony, all of them are mostly late. (Tr. 35). He described the payment practice in the elevator industry as "always late." (Tr. 36). Similarly, John Van Bremer, the Vice President in charge of finance for Regency Elevator Products Corporation, a company that for 9 years manufactured elevator parts and does engraving on elevator parts, testified as to the billing practice in that industry, focusing on engraving parts for elevators, that when a job is completed, it is billed and payments are usually not received for 60, 90, or 120 days or later, and are still not considered late. (Tr. 48). Mr. Van Bremer testified that his company's payment terms are net 30 days but explained that in the elevator parts industry, it is not unusual for a payment to be made within 120 days. (Tr. 48–9). Mr. Van Bremer testified that over a nine year period, only a few of his company's customers paid within a 30 day term, 20% paid within a 60 day term, 40% paid between a 60 and 120 day period and that the rest paid within a term greater than 120 days. (Tr. 49). Moreover, Mr. Van Bremer agreed with Mr. Friedrich's testimony that the extent of lateness of payment is never consistent. (Tr. 50).

Dennis Barker, a licensed CPA in the State of New Jersey, testifying on behalf of the Plaintiff, was unable to contradict Mr. Friedrich's or Mr. Van Bremer's statements that late payments were the norm in the elevator parts industry. (Tr. 23).

Despite Parkline's and Regency Elevator's invariably late payments, Mr. Friedrich testified that no unusual actions were ever taken to collect those payments. (Tr. 31, 33). Mr. Friedrich did not write threatening letters, engage a collection agency or contact a lawyer. (Tr. 31, 33). Mr. Van Bremer's testimony confirmed the collection practices detailed by Mr. Friedrich. Mr. Van Bremer stated that he did not do anything unusual to collect late payments: "We never hired a lawyer. We don't send threatening letters. We call them up and say can you do something." (Tr. 48, 51). In fact, Mr. Van Bremer stated that he never had to bring an action to collect on a delinquent debt. (Tr. 51). Richard Durham, also testified that although Parkline was late on every payment, Elevator Products "took the normal procedure we take with any other customer that pays late. We call them up." (Tr. 53). Mr. Durham stated that this internal collection method was utilized to collect debts that were up to one year old. (Tr. 53–4). After one year, however, Elevator Products utilizes a collection agency. (Tr. 54). Durham acknowl-

The length for time of payment on the second summary is illegible. (D–3). The Court's review of the dates indicates that the lateness of the payments varied from two to nine months. (Tr. 40) (D–3). Of the 24 payments on the second summary, 1 was two months late, 8 were three months late, 5 were four months late, 3 were five months late, 3 were six months late, 2 were seven months late, 1 was payment was eight months late and 1 was nine months late. (D–3).

3. Five out of 25 payments, or 20%, were four months late; Seven, or 28% were five months late; three, or 12%, were six months late; and five, or 20% were seven months late. (D–4). The remainder were each one, three, eight, ten and fourteen months late. *Id.*

edged that on one occasion during the 90 day period, on January 19, 1990, Elevator required payment by a certified check from Parkline in the amount of $11,855.00 for payment of invoices, some of which were almost a year old. (Tr. 56) (P–12).

At issue in this adversary proceeding are four late payments, totalling $19,525.50, which were received by Hoole Machine within 90 days prior to Parkline's filing for bankruptcy. The information pertinent to these payments is summarized as follows:

| Invoice Date | Invoice Number | Total of Invoice | Check Number | Check Amount | Payment Date | Time Gap |
|---|---|---|---|---|---|---|
| 9/20/89 | # 3454 | $ 3,100.00 [4] | 191 | $3,800 | 1/29/90 | 132 days |
| | # 2947 [5] | $ 800.00 | | | | |
| 8/31/89 | # 3442 | $ 8,400.00 [6] | 120 | $9,125.50 | 1/8/90 | 133 days |
| 9/7/89 | # 3451 | $ 1,625.00 | | | | 126 days |
| 9/20/89 | # 3454 | $ 3,000.00 | | | | 113 days |
| 11/20/89 [7] | # 3464 | $12,525.00 | 1044 | $3,600 | 2/26/90 | 98 days |
| 11/20/89 | # 3464 | $12,525.00 | 1041 | $3,000 | 2/1/90 | 73 days |

(Tr. 14–18) (P. 1–9). All of the subject invoices paid during the 90 day preference period stated payment terms of "net 60 days." (Tr. 16).

Plaintiff's expert, Mr. Dennis Barker, the accountant retained by the trustee in this case, testified that at the time these payments were made, during the 90 day period preceding the bankruptcy filing, Parkline was insolvent. (Tr. 20). Mr. Barker stated that secured claims against the estate are in excess of a million dollars and unsecured claims total at least two million dollars.[8] (Tr. 19) (P–11). Among the priority claimants are the Internal Revenue Service, the State of New York and the State of New Jersey. (Tr. 19) (P–11). As of the time of trial, the balance of the estate was $16,856.32. (Tr. 18) (P–10). Thus, Mr. Barker opined that there would be no dividend made to general unsecured creditors. (Tr. 20). As a result of the four payments alleged to be preferential, Mr. Barker concluded that "Hoole Machine[ ] receive[d] more than they would have received if the bankruptcy had proceeded to

full administration and unsecured creditors were given a dividend[.]" (Tr. 21).

Hoole Machine presented additional evidence to show that after the receipt of these four payments, but during the preference period, additional services worth $10,405.00 were provided to Parkline. (Tr. 44–5). Although, Parkline was billed for these services, payment is still outstanding. (Tr. 45).

These invoices totaling $10,405.00 are summarized as follows:

| Invoice Number | Invoice Date | Amount of Invoice |
|---|---|---|
| # 3474 | 1/12/90 | $4,450.00 |
| # 3479 | 2/5/90 | $ 535.00 |
| # 3485 | 2/19/90 | $1,135.00 |
| # 3495 | 3/5/90 | $4,285.00 |

(Tr. 44) (D–3).

## DISCUSSION

 Section 547 of the Bankruptcy Code provides the authority to avoid transfers that are deemed to be preferential. 11 U.S.C. § 547. The determination of whether a transfer was preferential consists of two steps. *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.*, 891 F.2d 66 (3d Cir.1989); *In re Jolly "N", Inc.*, 122 B.R. 897, 902 (Bankr.

---

4. Payment was made on this invoice in the amount of the balance of $3000.00.

5. This invoice was not entered into evidence but is referenced during the trial. (Tr. 16).

6. Partial payments were made on two of the invoices: on invoice number 3442, payment was in the amount of $7,400.00 and on invoice number 3454, a partial payment of $100.00 was made. Invoice number 3451 was paid in full in the amount of $1,625.00.

7. The Proposed Findings of Fact and Conclusions of Law submitted by both Plaintiff and Defendant indicate the date of this invoice is 1/20/90. (Tr. 17–18) (P–6).

8. The Debtor's bankruptcy petition, Schedule A–1 reflects scheduled priority claims of $1,193,-153.35, Schedule A–2 reflects secured claims in the scheduled amount of $1,865,494.17, and Schedule A–3 indicates that unsecured claims are in the scheduled amount of $3,509,676.33. (P–11). The assets listed in the original petition totaled $5,504,708.68.

D.N.J.1991). Initially, the Trustee must establish by a preponderance of the evidence the five elements of a preferential transfer set forth in 11 U.S.C. § 547(b). *J.P. Fyfe, supra,* 891 F.2d at 69; *Jolly "N", supra,* 122 B.R. at 902–03. Then, the transferee bears the burden of demonstrating that although a transfer was preferential, it is excepted from avoidability. *Id.*

11 U.S.C. § 547(b) provides as follows:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider, and (5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

At trial Hoole Machine did not contest the Trustee's assertion that the transferred payments met all five of the requisite elements. Indeed, the Court finds that the Trustee met his burden of establishing the presence of all five elements of a preference: (1) each of the four payments were transfers of an interest of the debtor in property which benefitted Hoole Machine; (2) the invoices establish that payment was for engraving services previously rendered; (3) the presumption of insolvency afforded by § 547(f) and Plaintiff's expert testimony that Parkline was insolvent at the time of the transfer were unrefuted; (4) the evidence established, and Hoole Machine admitted, that the transfers were made

within 90 days of Parkline's filing for bankruptcy; (5) finally, Mr. Barker's unrebutted testimony that "Hoole Machine[ ] receive[d] more than they would have received if the bankruptcy had proceeded to full administration and unsecured creditors were given a dividend," is sufficient to satisfy the fifth element. (Tr. 21). Therefore, the Court will address the applicability of Hoole Machine's affirmative defenses.

*Ordinary Course of Business Exception*

11 U.S.C. § 547(c)(2) provides:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

11 U.S.C. § 547(c)(2).

The purpose of the Ordinary Course of Business Exception under section 547(c)(2) is to "protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the debtor and the transferee ... and to leave undisturbed normal financial relations, because [such an exception] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditor during the debtor's slide into bankruptcy." *Jolly "N",* 122 B.R. at 905 (quoting H.R.Rep. No. 95–595, 95th Cong., 1st Sess., 373–74 (1977), reprinted in U.S.Code Cong. and Admin.News 1978, pp. 5787, 6329, 6330).

Hoole Machine must prove, by a preponderance of the evidence, each of the three components of section 547(c)(2). § 547(g); *J.P. Fyfe,* 891 F.2d at 69; *Jolly "N",* 122 B.R. at 905; *In re Fred Hawes Org., Inc.,* 957 F.2d 239, 243 (6th Cir.1992), *reh'g denied,* (6th Cir.1992), *reh'g, en banc denied,* (6th Cir.1992). Neither the Bankruptcy Code nor the legislative history are instruc-

tive of the meaning of the terms "ordinary course of business" or "ordinary business terms." *Fiber Lite Corp. v. Molded Acoustical Prods., Inc., (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 223 (3d Cir.1994).

Whether the transfer occurred in the "ordinary course of business" between Parkline and Hoole Machine is a subjective inquiry. *Jolly "N"*, 122 B.R. at 906. Factors pertinent to the subjective inquiry of whether the transfers were made in the "ordinary course of business" between Parkline and Hoole Machine include:

> (1) the length of time the parties have engaged in the type of dealing at issue; (2) whether the subject transfer was in an amount more than usually paid; (3) whether the payments were tendered in a manner different from previous payments; (4) whether there appears any unusual action by either the debtor or creditor to collect or pay on the debt; and (5) whether the creditor did anything to gain an advantage in light of the debtor's deteriorating financial condition.

*Id.*

■ Some courts consider lateness of payment to be particularly significant to the determination of whether a payment is "ordinary." *Hawes Organization*, 957 F.2d at 244. Lateness of payment, however, does not preclude a finding that the payment was made in the ordinary course of business. *In re Yurika Foods Corp.*, 888 F.2d 42, 45 (6th Cir.1989); *Matter of Xonics Imaging, Inc.*, 837 F.2d 763, 765 (7th Cir.1988) (§ 547 permits the parties' history of late payments to be ordinary); *In re Faleck & Margolies, Inc.*, 153 B.R. 123, 126 (S.D.N.Y.1993) (late payments can be found to be in the ordinary course of business); *In re Decor Noel, Corp.*, 134 B.R. 875, 881 (W.D.Tenn.1991); *In re Classic Drywall, Inc.*, 121 B.R. 69, 75 (D.Kan.1990); *In re Jerry–Sue Fashions, Inc.*, 91 B.R. 1006, 1008 (Bankr.S.D.Fla. 1988). Both the Sixth and Seventh Circuits, however, deem late payments to be presumptively "nonordinary." *Hawes Organization*, 957 F.2d at 244; *Xonics Imaging Inc.*, 837 F.2d at 767.

■ The categorization of a late payment as ordinary, is based not only upon the parties' dealings, but also upon the contractual terms governing their relationship. *Hawes Organization*, 957 F.2d at 245. Variation from contractual terms is not fatal, but can also establish the "ordinary course of business" between parties. *Fiber–Lite Corp. v. Molded Acoustical Prods., Inc., (In re Molded Acoustical Prods., Inc.)*, 150 B.R. 608 (E.D.Pa.1993) *aff'd*, 18 F.3d 217, 222–23 (3d Cir.1994) (payments ranging 71–113 days late, despite a term of 40–45 days net, were in ordinary course of business); *In re Richardson*, 94 B.R. 56, 61 (Bankr.E.D.Pa.1988); *Hawes Organization*, 957 F.2d at 244 ("long history of dealing between parties could counteract the literal terms of a contract"); *Jerry–Sue Fashions*, 91 B.R. at 1008 (course of dealing exceeding payment terms was made according to ordinary business terms).

There appears no dispute that Parkline incurred the debts at issue here in the ordinary course of its business and that of Hoole Machine pursuant to § 547(c)(2)(A). The Court is also satisfied that Hoole Machine has sustained its burden of proving by a preponderance of the evidence that the four payments at issue were made in the ordinary course of business and business dealings between Parkline and Hoole Machine as required by section 547(c)(2)(B).

As the facts detailed above indicate, Parkline had a history of making late payments to Hoole Machine since the inception of their relationship in 1981. (Tr. 25). There was no testimony presented to indicate that the four payments were in an amount more than was usually paid or that payment was made in any way other than what was customary between the parties. Hoole Machine established that partial payments were common and that the method of payment was always by check. Hoole Machine further established that there were no unusual actions taken by either Hoole Machine or Parkline to pay or collect on the invoices. The President of Hoole Machine, Mr. Friedrich, testified that he did not write threatening letters or engage a collection agency or lawyer. (Tr. 31). Mr. Friedrich also testified that he was not aware of Parkline's financial problems

and did nothing to gain an advantage from Parkline's deteriorating financial condition. (Tr. 34–35).

Despite the presence of a 60 day net term on Hoole Machine's invoices to Parkline, the parties' dealings establish that payments beyond the net terms were customary. In fact, payments were never made in a timely manner. The first summary of payments introduced at trial indicated that the majority of payments, 12 out of 19 payments or 63%, were four months late. (D–2). The second summary introduced by Hoole Machine showed that a significant portion of payments, 8 out of 24 or 33%, were three months late. (D–3). Of the payments alleged to be preferential, the 1/29/90 payment was 4.4 months late, the 1/8/90 payment averaged 4.1 months late,[9] the 2/26/90 payment was 2.6 months late, and the 2/1/90 payment was 2.4 months late.

Therefore, although the four payments at issue were late, they were made in accordance with the parties' ordinary course of business as required by § 547(c)(2)(B).

In addition to the subjective inquiries pertinent to the parties ordinary course of business, the Court must review the transactions from an objective perspective to determine whether they were in conformity with "ordinary business terms." § 547(c)(2)(C).

The Third Circuit adopted, with slight modification, the Seventh Circuit's definition of "ordinary business terms." *Molded Acoustical,* 18 F.3d at 224 (citing *In re Tolona Pizza Prod. Corp.,* 3 F.3d 1029, 1033 (7th Cir.1993)). The definition adopted by the Third Circuit provides as follows:

> "[O]rdinary business terms" refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so [unusual] as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.

*Id.* (quoting *Tolona,* 3 F.3d at 1033). This definition is consonant with the purpose of § 547 of preventing favoritism toward certain creditors. *Id.* at 223. The Third Circuit, however, tempered the necessity of showing strict conformance with the industry standard by deeming the duration of the relationship between the parties to be particularly relevant.

> [T]he more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2).

*Id.* at 225. Thus, parties having a longer-term relationship "will be able to depart substantially from the range of terms established under the objective industry standard inquiry and still find a haven in subsection C." *Id.* at 226.

In the instant case, the relevant industry the Court must examine is the elevator parts industry. To assist the Court in the determination of the payment practices in the elevator parts industry, the Court heard the testimony of Mr. Friedrich, the President of the creditor corporation, Hoole Machine, Mr. Van Bremer, the Vice President in charge of Finance of Regency Elevator Products Corporation, and Mr. Durham, the controller of Elevator Products Corporation, another creditor of Parkline.

Mr. Friedrich, Mr. Van Bremer and Mr. Durham all testified that in the elevator parts industry, late payments are common. Mr. Friedrich described the industry's payment practices as "always late." (Tr. 36). Mr. Van Bremer stated that it was not uncommon for payments in the industry to be 120 days late. (Tr. 48–9). Finally, both Mr. Van Bremer and Mr. Friedrich agreed that the payment practices in the elevator parts industry are never consistent. As a result of the foregoing, the Court is persuaded that all four payments were in accordance with the ordinary business terms of the industry. § 547(c)(2)(C).

Moreover, considering that Parkline and Hoole Machine had a well established relationship dating back to 1981, any deviation

---

**9.** The monthly figure is represented in terms of an average because this payment was applied to three invoices which were 4.4, 4.2, and 3.7 months late.

from the industry norm is permitted significant latitude. *Molded Acoustical,* 18 F.3d at 225. Thus, although the Court finds that the payment practices between Parkline and Hoole Machine were fully in accord with the industry norm, even if there was a deviation, the extensive duration of the parties' relationship would moderate strict conformance with the industry practices.

Finally, the Court must determine whether Parkline and Hoole Machine maintained a stable relationship prior to, and throughout, the insolvency period. *Id.* Clearly, as the findings of fact outlined above indicate, the relationship continued in the same exact manner as it had prior to the insolvency period and no unusual actions were taken to collect.

The Trustee argues that the consideration of late payments as being within the ordinary course of business would permit industries to establish a history of late payments and thereby avoid the consequences of § 547. (Tr. 8). Additionally, the Trustee asserts that late payments in the elevator industry are so inconsistent and unpredictable, that there is no proven industry standard at all. (Tr. 62). The court in *Classic Drywall, supra,* 121 B.R. at 69, 77, rejected similar arguments and stated that "[a]nother decision rejecting an industry standard as vague and indefinite has not been found by this court nor cited by the parties." As that court articulated, "[i]t is one thing to say the evidence is unpersuasive and inconclusive on what is industry norm, but it is quite another to reject the norm as incompatible with the notion that business terms should be definite." *Id.* at 78. This Court is satisfied that Hoole Machine has established by a preponderance of the evidence that the subject transfers were "made according to ordinary business terms." § 547(c)(2)(C).

Having found that the four transfers were incurred and made in the ordinary course of each party's business and in the ordinary course of dealings between the debtor and the creditor here, and that the transfers were made according to the ordinary business terms of the industry, this Court finds that the Trustee is not entitled to avoid any of the four payments made by Parkline to Hoole Machine. § 547(c)(2)(A), (B), and (C).

As a result, it unnecessary to discuss the alternative relief requested by Hoole Machine to except the payments from avoidability under the new value exception. § 547(c)(4).

### CONCLUSION

For the reasons set forth above, the Court finds in favor of Hoole Machine and excepts from avoidability the four subject payments based on the ordinary course of business exception. § 547(c)(2). The Trustee's Complaint against Hoole Machine shall be dismissed with prejudice.