by the other witnesses as to what was seen on the Sunday morning in question.

Appellant did not testify or offer any evidence in his own behalf. We will discuss the contentions advanced by counsel in brief and in argument.

 He first contends that the court erred in failing to instruct the jury that such exposure "must have been committed either in public or in such close proximity to a public place that such acts could be observed by the public who had business in such close proximity." In discussing a prosecution of this same nature, the Supreme Court of this State in Moffit v. State, 43 Tex. 346, said, "The publicity contemplated in the Code has reference to persons who do or can see it rather than to the place." The record before us here is clear that appellant's nudity was observed by fifteen or twenty people over a two or three-hour period and that appellant had stated he was in the business of running a health camp where people spent their weekends in the nude. It must be remembered that the officers were not on appellant's property during their period of observation. The court in his charge instructed the jury as follows, "The term 'in public' as used in this charge, has reference to persons who do or can see the act rather than to the place where the act is committed," which is tantamount to the pronouncement of our Supreme Court in Moffit.

Appellant next contends that the State failed to prove that appellant "designedly" "exhibited" his person. The fact that he designedly did so is obvious from the fact that he set himself up in business of running a nudist camp at a place where he might reasonably expect to be and was in fact seen by persons on property not his own, as well as those who were gathered there at the camp. We do not construe the statute as authorizing anyone to invite a number of people to his home and then exhibit himself to them in the nude with impunity. It is the persons who can and

do see the exhibition rather than the place where the exhibition is made which controls under the statute. These people were not members of his family and were therefore members of "the public." To hold otherwise would sanction any violation of the law so long as those who participated were members of a club to which they paid a fee to join. The Court of Appeals in Tucker v. State, 28 Tex.App. 541, 13 S.W. 1004, said that the term "obscene and indecent exhibition of the person" meant an exposure of those parts of the person which are commonly considered as private, and which custom and decency require should be covered and kept concealed from public sight. There is nothing in that definition which requires that the person making the exhibition should call attention to his acts.

Finding the evidence sufficient to sustain the conviction and no reversible error appearing, the judgment is affirmed.

Dora Cain JOHNSON, Appellant,

v.

L. A. FREYTAG et al., Appellees.

No. 6294.

Court of Civil Appeals of Texas.

Beaumont.

July 7, 1960.

Rehearing Denied Sept. 14, 1960.

258

Wheat & Zbranek, Liberty, for appellant.

T. J. Hightower, Liberty, Williams, Lee & Lee, Houston, for appellees.

McNEILL, Justice.

This case was brought by appellant, Dora Cain Johnson, against her son, Mason Cain, L. A. Freytag, Bobby K. Wallace and Morris Womack, appellees, to set aside a certain oil, gas and mineral lease upon a .52 acre tract in the Moss Hill oil field in Liberty County executed by her to L. A. Freytag, in which the others named were alleged to have an interest. Although the suit was one based largely upon fraudulent misrepresentations and conspiracy, both features appear to have been abondoned by appellant during the trial, and the controversy resolved itself around the right of appellant to withdraw her consent to the making of the lease and whether the lease was properly delivered to appellee Freytag. The case was tried to a jury and upon its verdict, judgment was rendered in favor of appellees sustaining the lease, and this appeal followed.

The Moss Hill oil field is situated about six miles north of the Moss Hill community, and the development there began in the late fall of 1956. Appellee Freytag, who lived at nearby Hull, came by Mason Cain's store at Moss Hill a time or two in December of that year inquiring about lands for lease in or around the new oil field. About

the same time or soon thereafter appellant, who lived near the oil drilling activity, got her son, Mason Cain, to take her to Liberty to check the records to see just what mineral interest she owned in the area. It developed that several years previously she and her husband had obtained a judgment to the .52 acre tract and that one-fourth of the minerals thereunder was owned by appellant and another one-fourth was owned by Mr. Johnson's children. Mrs. Johnson, appellant, had little education and at time of the trial was 74 years old and recently widowed. The undisputed facts show that an oral agreement was entered into between Mason Cain, acting for his mother, and Mr. Freytag whereby Freytag would pay Mrs. Johnson the sum of $125 as bonus for the lease, provided all of the children would join in the lease with her as lessors. This was agreeable with Mrs. Johnson and she signed and acknowledged the lease which Mr. Freytag had prepared. She stated at the time she did so, it was agreed between her and her son that if, at any time before all of the children signed the instrument she became dissatisfied with it, the lease would be returned to her and, as to her interest, the transaction would be at an end. Several witnesses corroborated her in this but Mason Cain denied the agreement was made, in effect stating that nothing was said one way or the other about returning the lease. An issue as to whether this agreement existed was submitted to the jury in this form:

"Special Issue No. 1

"Do you find from a preponderance of the evidence, that when Mrs. Dora Cain Johnson, on January 1, 1957, signed and acknowledged the lease in question, it was with the agreement with Mason Cain that any time she became dissatisfied therewith before all of the children had signed same, the lease was to become ineffective as to her interest and be returned to her?

"Answer 'Yes' or 'No'.

"To which the jury answered 'No'."

While three additional issues were submitted, the jury, complying with instructions given, answered only the second issue. This issue and its answer are:

"Special Issue No. 2

"Do you find from a preponderance of the evidence, that Mason Cain, on January 1, 1957, after Mrs. Dora Cain Johnson had signed the lease in question, had possession of said lease and was acting as the agent of Mrs. Johnson to obtain the signatures of the children?

"Answer 'Yes' or 'No'. Answer: 'Yes'."

The definition of "agent" accompanying this issue is identical with that in Reed v. Hester, infra.

Although the jury found no express agreement was made to return the lease to appellant if she became dissatisfied, nevertheless appellant insisted upon judgment since the jury found Mason Cain was acting as her agent and the lease had not been signed by all the children and it was still in her agent, Mason Cain's, hands when she requested its return, as matter of law she had the right then to have the lease surrendered to her; and this not having been done, she was entitled to judgment canceling it. We think appellant's contention should have been sustained. She had been paid no consideration and timely requested her son at least twice to return the lease which he did not do but, when all the children were finally induced to sign the lease (the last two by payments of $200 each), he delivered the lease to Freytag who immediately placed it of record. At the time of the trial below an oil well had begun producing on the tract but no right of innocent purchaser appears to exist as to any of appellees. Appellee Freytag himself knew promptly of appellant's dissatisfaction and request to have the

lease returned to her. In fact, he saw her then immediately for the first time and offered her $500 if she would be satisfied which sum she declined.

Our case is controlled by the extent of Mason Cain's agency for his mother. The evidence indisputably shows that he was his mother's agent for the purpose of obtaining the oil and gas lease on the .52 acre tract. On the way home from the trip to Liberty, mentioned above, Cain told his mother that he would try to get her a lease on the land. A few days later, on January 1, 1957, he came to her home with the lease involved for her to execute. Appellant testified that her son told her Mr. Freytag wanted to pay $100 for it but he got him up to $125 and that all of this bonus would be hers as the children did not want any and that it was a mighty good lease. She stated he told her he would hold the lease for her until all the children signed it and she was paid the $125. She also said that the lease was then agreeable with her and she signed and acknowledged it. According to her understanding, she said her son was acting for her and she was relying upon him. After she signed the lease, she went along with him on several trips to get the other children's signatures to the lease. Mason Cain testified Freytag had come by his store a time or two to ask about land to lease but he never asked about appellant's land and never made any offers thereon until after Cain had gone to Liberty with his mother. When asked as to how he worked out the terms of the lease with Mr. Freytag he said he, "was trying to take care of mother's interest as near as I could like she asked me to." He stated that through his suggestion Freytag increased his offer for the lease from $100 to $125 and then he told Freytag to get a lease prepared. Mr. Cain testified that he was acting in his mother's behalf for her and was doing his best to act right as far as he knew "for every benefit of hers". He told Mr. Freytag he wanted the best lease that could be prepared for his mother. When the lease was prepared he told his mother he could not find anything wrong with it, but he wanted her to be satisfied. In summary he testified:

"Q. Mason, from the beginning when your mama talked to you, or you talked to your mama about her leasing of this .52 of an acre of land, at that time, of course, you were interested in helping your mama out? A. Yes.

"Q. And of course, at all times during the preparation of the lease and the obtaining of the signatures to the lease, your understanding with your mama was that you were going to try to help her and that you were acting for her? A. Well, I didn't say that I was altogether acting but I told her I was doing my best to get a lease that would be the best prepared lease that I know of, for her.

"Q. In other words, but you were trying, at that time you were trying, and from the beginning of this transaction down as far as you went in getting signatures, the last signature you got was Harvey's, wasn't it? A. I believe that is right.

"Q. Down through getting the signature of Harvey, you were going around, you were carrying her around for her benefit? A. I certainly did.

"Q. In that connection, you were acting for her and for her benefit were you not? A. I was doing my best to help her.

"Q. Of course, you didn't charge her anything, did you? A. No, sir.

"Q. But you were acting for her as much as if she had hired you and paid you to do it, weren't you Mason? A. Well, I hadn't considered any pay, didn't want any pay.

"Q. I know you hadn't considered any pay but you were diligently carrying her around trying to get the lease signed up for her, just as much as if

she had hired you? A. I was doing my best to help her, I sure was."

On Cain's agency, Freytag testified:

"Q. In other words, in the very beginning, when he came to you he was undertaking to work out a deal for his mother? A. He was wanting to see that his mother could get something out of that lease and get a well drilled on it. That is what he wanted.

"Q. You understand that he was looking out after his mother's interest? A. Well, he was taking care of it for her, yes, sir.

"Q. Whatever you want to say, whether it be taking care of his mother's interest, or looking out for his mother's interest. That's right, isn't it? A. That's right.

"Q. And of course, your understanding was that he was going to take the lease and circulate it around and get it signed by all of the heirs? A. He was going to take it around and circulate it, or he was going to help me do that. He was going to assist in getting the heirs to sign it."

Again he testified:

"Q. In this transaction from the beginning, it was your understanding that Mr. Cain was looking out after his mother's interest? A. That's right."

 Appellees, however, insist that the finding of the jury in answer to Issue No. 2 was one limiting Cain's agency for his mother to the purpose of "obtaining the signatures and that he was to render an account of the transaction to her." Only on the ground that Freytag asked Cain to help get the children signed up on the lease, and Cain's promise to help him could there be contention made that he was any way acting or did anything for Freytag. And Cain having also promised his mother to do the same, this evidently prompted the

trial court's submission of the issue as worded. The issue may be purely evidentiary as appellees contend, but whether or no, in view of the testimony of two appellees themselves, Cain and Freytag, above set forth, we cannot accept the restricted view of the agency urged. The responsibility of an agent may not be broken down into isolated segments so that the agency changes in color and importance from step to step in a transaction such as exists here. The obligation is one and entire. By virtue of the relationship pictured, appellee Cain owed to his old, uneducated and widowed mother the duties of loyalty and obedience to her instructions until consummation or cancellation of the deal. Reed v. Hester, Tex.Com.App., 44 S.W.2d 1107; Baker v. Gray, Tex.Civ.App., 290 S.W.2d 543; Hahl v. Kellogg, 42 Tex.Civ.App. 636, 94 S.W. 389; 3 C.J.S. Agency § 138, pp. 6–8. A deed or oil lease is not "executed" until there is delivery of it. Strippelmann v. Clark, 11 Tex. 296; Koppelmann v. Koppelmann, 94 Tex. 40, 45, 57 S.W. 570. Until delivery of the lease was legally made to Freytag and the bonus of $125 paid, appellant was entitled to revoke the transaction, and this she did. Appellees argue that while Freytag agreed to buy the lease upon condition that all of Mr. and Mrs. Johnson's children joined in it, he could waive this condition. He could waive the condition and probably did when he offered appellant the $500. But even so, appellant had theretofore requested the return of the lease while it was in her agent's hands, which request she never withdrew.

It is not to be inferred from what we have said that Cain acted dishonestly in failing to obey his mother's request for return of the lease. We think his action and conduct was based upon a misapprehension of the law, as, at the last time she asked him for it he told her: "A. I told my mother that it wasn't made to either one of us, that what had been signed was signed before legal instrument by Notary, and it was Mr. Freytag's, the lease was made to

Mr. Freytag." It is apparent from this he was placing the legal construction on the lease that when his mother signed and acknowledged it she could not revoke it.

■■ While appellees took the position in the trial court that Cain was either (a) the agent of his mother and his acts bound her; or (b) the agent of Freytag so that appellant's delivery of the lease to him was delivery to Freytag, they insist here the facts show a true escrow of the lease with Cain as depositary. That since Freytag asked Cain to help him get the children to sign the lease which Cain said he would do, this changed the relationship between the latter and his mother so that he became agent or trustee for both parties for the purpose of holding the lease, and therefore bound to deliver it to Freytag upon fulfillment of the condition that all the children sign, or upon waiver of such condition by Freytag. It was not shown that appellant knew of this request of Freytag nor agreed thereto. The record fails to establish an escrow. In order to do so, a mutual agreement therefor is necessary, although this may rest in parol. Simpson v. Green, Tex. Com.App., 231 S.W. 375; Pearson v. Kirkpatrick, Tex.Civ.App., 225 S.W. 407. The escrow agreement should be clear and definite. Tanner v. Imle, Tex.Civ.App., 253 S.W. 665(13). Furthermore, the instrument being in the custody of appellant's agent, there can be no escrow. Tyler Building & Loan Ass'n v. Biard & Scales, 106 Tex. 554, 171 S.W. 1122, 1200; Puckett v. Hoover, 146 Tex. 1, 202 S.W.2d 209; Pickle v. Whitaker, Tex.Civ.App., 224 S.W.2d 741. Since Cain was a party to the instrument he could not be an escrow depositary. Bradley v. Howell, Tex.Civ.App., 126 S.W.2d 547; Smith v. Daniel, Tex.Civ.App., 288 S.W. 528. An escrow depositary should be a stranger or third party. 17 Tex.Jur. 94. We do not mean to say that under no circumstances may an agent of or party to an instrument be a depositary, but in the absence of a clearly expressed mutual agreement of both parties to the instrument to that effect it will not be implied in the face of the fundamental rule that the principal is entitled to the undivided loyalty of his agent.

There are circumstances in this case indicating that the two developers of the Moss Hill field, Texas Gas and Exploration Company and Dodgen Oil & Gas Company, arrived on the scene late and may have been an inducing cause of appellant's desire to have the lease returned to her. At any rate, they finally obtained from appellant a "top" lease on the .52 acre tract. Appellees argue that this latter lease is not worth anything like the Freytag lease to her. We, however, are not called upon to decide which is best for her. Appellant appears to have her faculties and no allegation or assertion is made that she is not sui juris. She had the legal right at the time she did to demand a return of the lease; she is well represented by counsel and we think the argument made is not relevant to the present suit. Schmidt v. Baar, Tex.Civ. App., 283 S.W. 1115.

The judgment of the trial court is set aside and judgment is here rendered that appellant Dora Cain Johnson be and is decreed the cancellation of the oil and gas lease involved, insofar as it affects her interest in the .52 acre tract, as against L. A. Freytag, Mason Cain, Bobby K. Wallace and Morris Womack, appellees.

Reversed and rendered.