In re CHESAPEAKE ASSOCIATES, LIMITED PARTNERSHIP, d/b/a Chesapeake Estates Apartments, Debtor.

Eric RAJALA, Trustee, Plaintiff,

v.

The HOLLAND CORPORATION, Defendant.

Bankruptcy No. 89–20341–7.
Adv. No. 91–6031.

United States Bankruptcy Court, D. Kansas.

June 30, 1992.

---

Laurence M. Frazen, Phillip G. Greenfield, Bryan, Cave, McPheeters & McRoberts, Kansas City, Mo., for trustee Eric Rajala.

Peter V. Ruddick, Speer, Austin, Holliday & Ruddick, Olathe, Kan., for Holland Corp.

## MEMORANDUM OPINION AND ORDER

BENJAMIN E. FRANKLIN, Chief Judge.

This matter comes on before the Court pursuant to cross-motions for summary judgment in the trustee's action to avoid and recover an alleged preferential transfer. The trustee is represented by Laurence M. Frazen and Phillip G. Greenfield of Bryan, Cave, McPheeters & McRoberts. The Holland Corporation is represented by Peter V. Ruddick of Speer, Austin, Holliday & Ruddick. Upon the filing of stipulations and memorandum briefs by the parties, the Court took the matter under advisement.

## FINDINGS OF FACT

The parties stipulated to the relevant facts necessary for a determination of the issues in this case. The facts as stipulated to by the parties are as follows:

1. The Court has jurisdiction over this matter pursuant to Title 28 U.S.C. §§ 157 and 1334, as this is a proceeding which arises in the Chapter 7 proceeding of Chesapeake Associates, Limited Partnership, d/b/a Chesapeake Estates Apartments (hereinafter "Chesapeake").

2. Venue is proper in this Court pursuant to Title 28 U.S.C. § 1409.

3. This is a core proceeding pursuant to Title 28 U.S.C. § 157(b)(2)(F).

4. The Holland Corporation (hereinafter "Holland") is a Kansas Corporation engaged in the business of aggregate production, as well as the business of grading, asphalt paving, and concrete construction.

5. Holland owns its own quarries and produces raw aggregate from limestone. The aggregate is then utilized in the paving and asphalt aspects of Holland's work. Holland's concrete construction business focuses on curb and gutter installation and parking lot construction.

6. Chesapeake is a Kansas limited partnership in which Thomas Martin and Marion Martin are the sole limited and general partners.

7. On or about July 9, 1985, Holland and Mid–America Construction, Inc. ("Mid–America") entered into a subcontract agreement ("Subcontract Agreement") in which Holland contracted to perform various aspects of the construction of Chesapeake Estates Apartments for the owner of that project (Chesapeake).

8. Thomas Martin was a principal in Mid–America.

9. Pursuant to § 3 of the Subcontract Agreement, Holland was to be paid, subject to additions and deductions for Change Orders or Field Orders, the total sum of $1,541,800 in consideration for its performance under the Subcontract Agreement.

10. Pursuant to § 4 of the Subcontract Agreement, Mid–America agreed to pay Holland for progress on the project on a monthly basis. Mid–America was to make monthly payments to Holland pursuant to written requisitions for payment submitted

by Holland for work performed during the current month and work performed from the 20th day of the previous month.

11. Pursuant to § 4, ¶ C of the Subcontract Agreement, Holland would issue an invoice to Mid–America by the 23rd of each month. Mid–America would then review the invoice and prepare a check for Holland between the 15th and the 20th of the following month.

12. Holland's work entailed installation of sanitary and storm systems, grading of the site, preparation of the apartment building sites, preparation of the roadway subgrade, preparation of the parking lot subgrade, installation of the concrete curbs and gutter on the parking lot subgrade, installation of the parking lots and the roadways, and the installation of the asphalt. When all of the above was complete, Holland was to place four inches of top soil on the site to prepare it for landscaping.

13. Section 4, ¶ B of the Subcontract Agreement provides for the withholding of "retainage" by Mid–America. From each monthly payment due to Holland, Mid–America would retain 10% of that amount. The custom and practice of the construction industry is to require retainage to insure that the contractor completes the work in a timely fashion.

14. The custom and practice of the industry provides retained funds would not be used as potential set-off against disputes surrounding performance under the Subcontract Agreement. Under the Subcontract Agreement, the money was due and owing to Holland. The sole purpose of the retainage was to motivate Holland to complete the job and, upon satisfactory completion, Holland was to receive the full amount of the retainage.

15. Pursuant to § 4, ¶ E, the total amount retained as described above was to be paid to Holland within thirty (30) days after the work required under the Subcontract Agreement had been completed and, among other things, accepted by the architect. In practice, the retention is paid when the project is substantially complete.

16. Throughout the term of the Subcontract Agreement, Mid–America exercised its rights under the Subcontract Agreement and retained 10% of all monies due and owing to Holland.

17. After the Subcontract Agreement was executed in July of 1985, Holland's work began on the Chesapeake project immediately.

18. Holland's work on the project was completed in or about November of 1987.

19. The final invoice from Holland to Mid–America is Invoice No. 3418 dated November 19, 1987.

20. Invoice No. 3418 from Holland to Mid–America reveals the total completed contract amount was $1,911,734.14. The $369,934.14 difference between the original contract price and the amount ultimately billed to Mid–America is due to Change Orders or Field Orders which accumulated from 1985 to 1987. A Change Order or Field Order memorialized agreements between Mid–America and Holland for additional work over and above the work required by the Subcontract Agreement.

21. With respect to Change Orders and Field Orders, Holland would obtain a written agreement with respect to the additional work from Mid–America before it began the work. Holland would complete the work and invoice Mid–America. Mid–America would then write their Change Orders or Field Orders from Holland's invoice.

22. As of November 19, 1987, Holland had completed its contract obligations at a total contract price of $1,911,734.14. Mid–America had retained, pursuant to § 4, ¶ D, $191,173.44, leaving a total current payment obligation of $1,720,560.70. Mid–America had previously paid $1,669,779.75. Accordingly, as of November 19, 1987, Mid–America owed Holland $50,780.94 under the Subcontract Agreement.

23. Between July of 1985 and November of 1987, complete ownership of Chesapeake was transferred to Thomas and Marion Martin. Prior to that ownership change, Holland was looking to Mid–America for payment on the Subcontract Agree-

ment. Following the ownership change, Holland was looking to Chesapeake for payment on the balance due under the Subcontract Agreement. Following the ownership change, Thomas Martin acted on behalf of Chesapeake with respect to payments due Holland under the Subcontract Agreement.

24. On or about November 19 of 1987, James D. Holland began collection efforts with respect to the $50,780.94 due under the contract and the $191,173.44 retainage. James Holland is the Treasurer of Holland, a member of its Board of Directors, and occupied the position of Chief Estimator for Holland during the relevant time period.

25. In either January or February of 1988, James Holland had direct contact with Tom Martin with respect to Invoice No. 3418, in an attempt to collect the $50,780.94 due Holland.

26. Because the collection efforts began in early 1988, and the ordinary practice between the parties with respect to payment was that the $50,780.94 should have been paid within 20 days of the following billing month, Martin and Chesapeake were not in accordance with the ordinary practice of payment with respect to the $50,780.94.

27. In the early part of 1988, Holland was not concerned with the retainage. During that time, Holland and Chesapeake's concern focused only on the $50,780.94 due under the Subcontract Agreement. Collection efforts centered only on the $50,780.94 because a dispute had arisen with respect to this amount.

28. Holland was not concerned with the payment of the retainage because it was not aware of any problems that would prevent receipt of the retention in full. In early 1988, Holland believed Martin and Chesapeake were solvent and Holland would receive the retainage in due course.

29. James Holland dealt with Becky Martin, an employee of Chesapeake, with respect to the dispute surrounding the $50,780.94. Negotiations continued in this regard throughout 1988.

30. At the end of the negotiations with Mid–America and Tom Martin in approximately August, 1988, Mid–America agreed to pay Holland the sum of $34,776.34 in settlement of the $50,780.94 in dispute. The amount was paid on August 9, 1988. The settlement did not impact the retainage monies due Holland.

31. After the settlement in August of 1988, the amount due as retainage was $184,303.68. However, the parties agreed that $22,826.59 worth of Field Orders would be added to that amount to bring the total amount Mid–America owed Holland to $207,130.27.

32. The $22,826 in Field Orders were not incorporated in Invoice No. 3418. Accounting for those was kept separate and apart from that document.

33. Pursuant to § 4, ¶ E of the Subcontract Agreement, the triggering event for payment of the retainage was acceptance of the subcontractor's work by the architect. By August of 1988, the architect had accepted Holland's work and the retainage was due Holland.

34. Between August of 1988 and November of 1988, Holland became increasingly concerned about payment of the retainage. Jim Holland had several telephone conversations with Tom Martin wherein he sought payment of the retainage. Jim Holland had between five and six conversations with Martin in this regard. Those conversations were grouped closer to November than August as Jim Holland's concern about payment of the retainage intensified.

35. Between August of 1988 and November of 1988, Holland became aware that other subcontractors of Chesapeake were not being paid their retainage. Jim Holland also had conversations in this time period with Tom Martin wherein Martin informed Holland he would have difficulty paying the full retainage.

36. In approximately November of 1988, Tom Martin informed Jim Holland he would not be able to pay the full amount of the retainage and broached the subject of settlement with Jim Holland. Martin

asked if the parties could settle on a lesser amount. Martin offered to settle the total amount due and owing of $207,130.27 for $92,000.

37. At this time, Jim Holland was confident that if Holland did not accept the $92,000 it ultimately would receive nothing from Chesapeake.

38. After considering the issue, Holland accepted Chesapeake's settlement offer of $92,000.

39. Thomas Martin, on behalf of Chesapeake, informed Holland the funds were available and the settlement would be consummated in due course.

40. Chesapeake delivered Check No. 005154 dated November 16, 1988 in the amount of $72,000 and Check No. 005176 dated November 18, 1988 in the amount of $20,000, payable to Brown, Koralchik and Fingersh ("Brown, Koralchik"), attorneys for Chesapeake, to Brown Koralchik. These checks were negotiated by Brown, Koralchik. Valley View State Bank honored the checks on November 16 and December 5, respectively. The checks were deposited in Brown, Koralchik's Trust Account at Oak Park National Bank for Chesapeake's benefit.

41. At all times relevant herein, Brown, Koralchik were attorneys for Chesapeake and an attorney/client relationship existed between Chesapeake and Brown, Koralchik. At the time Check Nos. 005154 and 005176 were deposited in Brown, Koralchik's Trust Account, the funds constituted property of Chesapeake.

42. From time to time, Brown, Koralchik facilitated settlement of other retainage claims against Chesapeake in an identical manner.

43. At all times the funds held by Brown, Koralchik were subject to the applicable rules of professional conduct with respect to trust accounts.

44. On December 6, 1988, a check was drawn on Brown, Koralchik's Trust Account made payable to Holland for the settlement of the retainage. However, prior to delivery of the check to a Holland representative, Brown, Koralchik attorneys re-

ceived notice of a Temporary Restraining Order ("TRO") entered in *Victoria Savings Assoc. v. Chesapeake Associates Limited Partnership, et al.*, 88–C12057 (District Court of Johnson County, Kansas). The TRO, issued by the court in *Victoria Savings*, was filed on November 22, 1988. The TRO prohibited the distribution of Chesapeake funds in contravention to the Court Order. Because of that Order, Brown, Koralchik attorneys did not deliver to Holland the $92,000 check. The December 6, 1988 check was ultimately voided.

45. On February 16, 1989, the TRO was dissolved.

46. On or about February 22, 1989, a check dated February 22, 1989 in the amount of $92,000 was drawn on Brown, Koralchik's Trust Account for payment to Holland Corporation.

47. The check was delivered to Holland representatives on February 22, 1989. The check was honored on February 22, 1989 by Oak Park National Bank.

48. The $92,000 in funds were credited to the account of Holland and Holland drew upon those funds.

49. The February 22, 1989 check from Brown, Koralchik contained a restrictive endorsement. That endorsement disclaimed any claims on future monies owed an account with Mid–America, Chesapeake or the City of Lenexa. By endorsing the check for deposit Holland Corporation waived any claims for future retainage held by Mid–America. Holland representatives discussed the provision and understood that by signing the provision they would be accepting $92,000 in settlement of the balance due under the Subcontract Agreement. After discussing that issue, representatives of Holland signed the check and negotiated it.

50. Chesapeake filed for protection under Chapter 11 of Title 11 of the United States Code on March 6, 1989.

51. Chesapeake was insolvent as that term is defined by 11 U.S.C. § 101(32)(B) at all times during the 90 days preceding the filing of its bankruptcy petition.

52. By accepting the $92,000 at issue in this case, Holland received more than it would have had the transfer not been made and Holland received payment of its claim to the extent provided by the provisions of Title 11.

53. The trustee made demand on Holland Industries for the alleged $92,000 preference on November 9, 1990.

## CONCLUSIONS OF LAW

The parties have stipulated to all the relevant facts and there are no issues of material fact in dispute. Therefore, the matters are ripe for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, which is made applicable to this proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure. Rule 56(c) provides that this Court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

The trustee's action seeks to avoid and recover a preferential transfer pursuant to 11 U.S.C. § 547(b). That section permits the trustee to recover, with certain exceptions, transfers of property made by the debtor within 90 days before the date of the filing of the bankruptcy petition. Pursuant to § 547(g), the trustee has the burden of proving the avoidability of a transfer under subsection (b). The parties agree that the only issue in dispute is whether the transfer occurred within the 90-day period required by § 547(b)(4). The parties have stipulated that the remaining elements under § 547(b) have been met in the present case. Section 547(b)(4) provides in pertinent part that:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

. . . .

(4) made—

(A) on or within 90 days before the date of the filing of the petition. . . .

The Court must therefore determine when the transfer was made for purposes of § 547(b)(4)(A). Furthermore, for there to be a transfer under § 547, the property transferred must have been property in which the debtor had an interest. The Court will address both of these issues simultaneously.

Holland argues that the "transfer" occurred on November 16, 1988 and December 5, 1988, when checks # 005154 and # 005176 payable from Chesapeake to Brown, Koralchik were honored by Valley View State Bank. In support of this argument, Holland argues that Brown, Koralchik's Trust Account should be classified as a *de facto* escrow account, and that pursuant to case law dealing with escrow accounts a "transfer" occurs when the debtor places the funds into the account. *See In re Coco*, 67 B.R. 365 (Bankr.S.D.N.Y.1986); *In re O.P.M. Leasing Services, Inc.*, 46 B.R. 661 (Bankr.S.D.N.Y.1985). Holland argues that Chesapeake retained only a contingent interest in the $92,000 after it deposited the funds in Brown, Koralchik's Trust Account.

The trustee, however, argues that the "transfer" occurred on February 22, 1991, when check # 1212 payable from Brown, Koralchik to Holland was honored by Oak Park National Bank. The trustee argues that the mere transfer of checks # 005154 and # 005176 from Chesapeake to its agent for purposes of delivery to Holland could not, in and of itself, divest Chesapeake of its interest in the $92,000. The trustee argues that the funds were not held "in escrow" and Brown, Koralchik was nothing more than a "custodian," as that term is defined in 11 U.S.C. § 101(11)(C):

(11) "custodian" means—

(C) trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors.

To resolve the issue of when the transfer was made for purposes of § 547, the Court must determine whether Brown, Koralchik was acting as Chesapeake's agent or as an escrow agent for both parties. The same analysis will determine what interest the debtor retained in the funds.

The escrow cases rely on § 547(e)(1)(B) and the impact of applicable state law on that section[1] to support the conclusion that the operative transfer for purposes of § 547(b) is the transfer by the debtor to the depositor. Section 547(e) provides in pertinent part that:

(e)(1) For the purposes of this section—

. . . .

(B) a transfer of a fixture or property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee.

(2) For the purpose of this section, except as provided in paragraph (3) of this subsection, a transfer is made—

(A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 10 days after, such time;

(B) at the time such transfer is perfected, if such transfer is perfected after such 10 days. . . .

The escrow cases approach the issue by addressing whether, under applicable state law, a judgment lien creditor of the depositor could acquire an interest greater than the beneficiary of the escrow by attachment of the escrow account. *See e.g. In re O.P.M. Leasing Services, Inc.*, 46 B.R. 661, 666–68 (Bankr.S.D.N.Y.1985). The Court in *In re O.P.M.* held that "the general rule in New York regarding escrow accounts is that unless the judgment debtor, as grantor, retains an interest in the escrowed property over and above the interest of the

grantee, the escrow account cannot be reached by the debtor's judgment creditors." *Id.* at 667.

The Court went on to find that under New York law, the deposit of property into escrow creates in the grantee such an equitable interest in the property that upon full performance of the conditions according to the escrow agreement, legal title will vest at once in the grantee. *Id.* Therefore, any judgment lien obtained with notice of the escrow agreement is subject to the equity of the grantee. *Id.* It is the immediate vesting of an equitable interest in the grantee that prevents a judgment lien creditor of the grantor from gaining an interest in the escrowed funds superior to that of the grantee.

■ This analysis as set forth in *In re O.P.M.* will only apply if the Court finds that the funds in the present case were held "in escrow". Absent an escrow arrangement whereby an equitable interest vests in the creditor, it is clear that the general rule applies and a judgment lien creditor of the debtor could acquire a superior interest in funds held by an agent of the debtor. *See Center v. McQuesten*, 18 Kan. 476 (1877) (holding that money in the hands of an agent to pay debts of principal to one creditor is liable to garnishment by another creditor and creditor has no better right to recover money than debtor/principal would have had); *Wilkerson v. Olcott*, 212 So.2d 119, 120–21 (Fla.App.1968) (funds in attorney's trust account for a specific purpose were subject to garnishment where client would have been entitled to funds upon demand); *See also In re Adams*, 102 B.R. 271, 273–75 (Bankr. M.D.Ga.1989) (where payment was deposited in attorney's trust account, attorneys served as merely agents and funds in ques-

---

**1.** "What constitutes a transfer and when it is complete" is a matter of federal law. *Barnhill v. Johnson*, — U.S. —, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (U.S.1992), (*citing McKenzie v. Irving Trust Co.*, 323 U.S. 365, 369–70, 65 S.Ct. 405, 407–08, 89 L.Ed. 305 (1945)). This is not surprising since the statute itself provides a definition of 'transfer'. *Id.* Section 101(54) defines "transfer" to mean "every mode, direct or indirect, absolute or conditional, voluntary or invol-

untary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." This statutory definition of "transfer" includes references to parting with "property" and "interests in property." "In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law." *Id.*

tion would have been property of the estate); *In re ABW, Inc.*, 29 B.R. 88, 89–90 (Bankr.D.Nev.1983) (where funds placed by debtor in an impound account were not considered in escrow, there was nothing to prevent the debtor from withdrawing the funds and the funds constitute property of the estate).

The Court finds that the elements necessary to establish that the funds placed in Brown, Koralchik's Trust Account were held "in escrow" are missing in the present case and that there is no evidence of an escrow agreement among the parties, no evidence of an agreement to condition delivery of the funds to Holland upon the performance of some act or the happening of some event, and Brown, Koralchik was not acting as an agent for both parties.

In order for the funds to be held "in escrow", there must be an escrow agreement among the parties. "The depository must be guided in carrying out its duty by what the contract says, for the agreement for escrow with its instructions constitutes the full measure of the duties and obligations assumed by the depository." *Lewis v. Shawnee State Bank*, 226 Kan. 41, 596 P.2d 116, 120 (1979); *See also Osborn v. Greco*, 226 Kan. 212, 596 P.2d 1233, 1237 (1979). The depositary is a third party to whom the principal parties to the contract have entrusted certain authority by the escrow agreement. "It is essential, of course, that he know the terms of the escrow agreement in order to understand his duties." *Nickell v. Reser*, 143 Kan. 831, 57 P.2d 101, 103–04 (1936). There is no evidence in the record that would support a finding by the Court that Chesapeake, Holland and Brown, Koralchik agreed to create an escrow.

The record also fails to establish that there was an agreement providing that delivery of the funds was conditioned upon the performance of some act or the happening of some event. "In order to impose a duty, beyond that of mere safekeeping, upon an escrow depository in connection with papers or instruments left in its custody the delivery and receipt of the papers and instruments must be conditioned upon

the performance of some act or the happening of some event *expressed in the agreement for escrow*." *Lewis v. Shawnee State Bank*, 226 Kan. 41, 596 P.2d 116, 120 (1979) (emphasis added). There was no condition precedent to release of the funds by Brown, Koralchik. Holland argues that delivery was conditioned on the endorsement of Check #1212 by Holland. There is no evidence before the Court that Brown, Koralchik required endorsement prior to delivery. Furthermore, Holland is arguing that an act that is performed *after* delivery is a condition to delivery.

The Court also finds that Brown, Koralchik was acting as attorney for Chesapeake and not as an agent of both Holland and Chesapeake. *See Sanders v. Park Towne, Ltd.*, 2 Kan.App.2d 313, 578 P.2d 1131, 1134–35 (1978) (stating that the depositary of an escrow is the agent of both the parties thereto) (citations omitted). "[I]t is the general rule the deposit of instruments in escrow cannot be made with one who is the agent of either of the parties to the instrument ..., for if the depository is the agent of the grantor, the instrument is retained by him; if the agent of the grantee, there is a delivery of the instrument." *Id.*, 57 P.2d at 103.

The parties have stipulated that "[a]t all times relevant herein, Brown, Koralchik were attorneys for Chesapeake and an attorney/client relationship existed between Chesapeake and Brown, Koralchik." Although it is possible that an attorney may act as an escrow agent, there must be some agreement to that effect. *See Johnson v. Freytag*, 338 S.W.2d 257, 262 (Tex.Civ.App. 1960), *error refused n.r.e.* (Jan. 18, 1961) (stating that the court does not mean to say that under no circumstances may an agent of or party to an instrument be a depositary, but in the absence of a clearly expressed mutual agreement of both parties to the instrument to that effect it will not be implied in the face of the fundamental rule that the principal is entitled to the undivided loyalty of his agent); *See also Entertainment and Amusements of Ohio, Inc. v. Barnes*, 49 Misc.2d 316, 267 N.Y.S.2d 359, 362 (1966) (stating that an

attorney of one of the parties to a transaction may act as an escrowee *upon the consent of both of the parties* as long as his duties are not in conflict with his responsibilities as an attorney and he is able to discharge his obligations to both parties) (emphasis added). There is no evidence that the parties intended or agreed to have Brown, Koralchik act as escrow agent on behalf of both parties.[2]

In an attempt to show that Brown, Koralchik owed a duty to both Chesapeake and Holland, Holland cites the Comments to the Kansas Supreme Court Rules Relating to Discipline of Attorneys. The Comments to Rule 1.15 state in pertinent part that:

> Third parties, such as client's creditors, may have just claims against funds or other property in a lawyer's custody. A lawyer may have a duty under applicable law to protect such third-party claims against wrongful interference by the client, and accordingly may refuse to surrender the property to the client.

The Comments merely state that a lawyer "may have a duty under applicable law," and Holland cites no authority for the proposition that the Rule creates an independent duty to creditors of the client.

Holland also argues that although an attorney's trust account may not technically be an escrow account, based on the reasoning in *K–M Auto Supply, Inc. v. Reno*, 236 A.2d 706 (Del.Sup.1967), a creditor could not acquire an interest greater than that of Holland by attaching the trust account and therefore the account should be treated as an escrow account. The Court in *Reno* states that "moneys in the hands of an attorney belonging to his client may be attached by the client's creditor. An attorney acting in this capacity is only an agent and his client's funds in his hands as agent are subject to garnishment according to the usual laws of agency." *Id.* at 706. The Court goes on to recognize that the right to attach is not an unqual-

ified right and "[i]f a client places money in the hands of his attorney to be turned over by him to a third person, *and that third person acquires an interest in the money,* it is no longer money of the client subject to attachment." *Id.* at 707 (emphasis added).

It appears that *Reno* is in line with the other cases cited which show that there is a general rule that funds in the hands of an attorney acting as the client's agent are subject to garnishment, and there is an exception for funds held "in escrow". *Reno* recognizes the general rule, but in that case the debtor deposited the funds with his attorney under an agreement that the funds would be paid over upon completion of a swimming pool in a "specified manner". *Id.* at 706. The Court noted that this was a conditional deposit and such a deposit is "in escrow". *Id.* at 707.

For Holland to prevail, an escrow arrangement must have existed between Chesapeake, Holland and Brown, Koralchik. An escrow arrangement was not present in *In re Allegheny, Inc.*, 86 B.R. 466 (Bankr.W.D.Pa.1988), and the Court addressed the issue of when a transfer occurs for purposes of § 547(b). In that case, the Court held that a settlement agreement carried no more weight than any other contract between two parties, and until property was actually in the possession of the creditor, any other creditor could have obtained a judicial lien which would have been superior to the interest of the creditor who was a party to the settlement. *Id.* at 471. *See also In re Mason*, 69 B.R. 876, 883–84 (Bankr.E.D.Pa.1987) (where funds were not held "in escrow" transfer can never be said to occur earlier than the physical transfer of funds by the debtor to the creditor).

The Court finds that there is no evidence of an escrow agreement and the attorneys were merely acting as an agent of Chesapeake. Therefore, the relevant

---

**2.** It would appear that Brown, Koralchik believed the funds in the trust account were still the property of Chesapeake. The parties stipulated that Brown, Koralchik did not deliver a prior check to Holland because a "TRO prohibited the distribution of Chesapeake funds in contravention to the Court Order."

transfer for purposes of § 547 occurred when Brown, Koralchik transferred the funds to Holland. With respect to payments made by check, the Supreme Court has held that the "transfer" of a debtor's property is complete for purposes of § 547(b)(4) on the day the check is honored by the drawee bank. *Barnhill v. Johnson, supra.* Check # 1212 from Brown, Koralchik to Holland was honored by Oak Park Bank on February 22, 1989. Chesapeake filed its petition under Chapter 11 of Title 11 on March 6, 1989. The transfer was made within the 90 days preceding the debtor's filing.

Holland argues that even if the transfer is considered to be preferential, the transfer would fall under the exception found in § 547(c)(2)(A–C) which provides that:

(c) The trustee may not avoid under this section a transfer—....

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

Pursuant to § 547(g), Holland has the burden of proving the nonavoidability of a transfer under subsection (c).

There is no dispute that the payment was for a *debt incurred* by the debtor in the ordinary course of business of the debtor and the transferee within the meaning of § 547(c)(2)(A). With respect to § 547(c)(2)(B), whether the transfer was made in the ordinary course of business of the debtor and the transferee is a subjective determination. *In re Classic Drywall, Inc.,* 121 B.R. 69, 75 (D.Kan.1990). "The relations of the debtor and the creditor are placed in a vacuum, and the transfer in question is assessed for its consistency with those relations." *Id.* (citations omitted). "What is subjectively ordinary between the parties is answered from com-

paring and contrasting the timing, amount, manner and circumstances of the transaction against the backdrop of the parties' traditional dealings." *Id.*

With regard to § 547(c)(2)(C), whether a *transfer* was *made* according to ordinary business terms is an objective determination. *Id.* To make this determination, the Court must compare and contrast the particular transaction against the "practices" or "standards" of the industry. *Id.*

The Court finds that Holland has not met its burden of proving that the transfer was made in the ordinary course of business under § 547(c)(2)(B), or made according to ordinary business terms under § 547(c)(2)(C). Holland's entire argument focuses on *when* the retention payment was finally made, and Holland asserts that deferring retainage payments until the project is substantially completed is a common practice in the construction industry. This argument completely ignores the fact that not only was the payment late, but it was also made pursuant to a settlement for an amount substantially less than the amount originally due.

Holland offers no support for the proposition that accepting lesser amounts for retainage claims because Chesapeake was experiencing financial difficulty was subjectively ordinary within the relationship of Holland and Chesapeake. Likewise, there is no evidence that it is objectively normal in the industry for subcontractors to accept lesser payments in settlement of contract claims when the contractor experiences financial difficulties.

*In re Energy Cooperative, Inc.,* 832 F.2d 997, 1004 (7th Cir.1987), involved a one-time payment to settle a breach of contract claim. The Court in *In re Energy Cooperative, Inc.* cites and agrees with the court in *In re Daikin Miami Overseas, Inc.,* that "payments made pursuant to a settlement agreement, which appear to be the result of an antecedent debt and prior dispute between the parties, are simply not in the ordinary course of business." *Id.* at 1005;

See In re Daikin Miami Overseas, Inc., 65 B.R. 396 (S.D.Fla.1986).

In this action, the trustee is also seeking prejudgment interest on the $92,000 transfer from the date of his demand on Holland. The trustee cites In re Bellanca Aircraft Corp., 850 F.2d 1275 (8th Cir.1988). In that case, the Court noted that "[t]he bankruptcy court held that awards of prejudgment interest are discretionary and depend on whether the preferred creditor could have ascertained the amount of the preferential payment without a judicial determination." Id. at 1281. The Court then stated that "[t]here is no statutory authority for the proposition that the court must award the trustee prejudgment interest in this situation." Id. This Court finds that an award of prejudgment interest is not warranted in the present case in light of the complex issues involved and the lack of binding authority directly on point.

IT IS THEREFORE, BY THE COURT, ORDERED That Holland's motion for summary judgment shall be and the same is hereby DENIED.

IT IS FURTHER, BY THE COURT, ORDERED That the trustee's motion for summary judgment shall be and the same is hereby GRANTED.

IT IS FURTHER, BY THE COURT, ORDERED That the trustee shall be entitled to avoid the $92,000 transfer in question pursuant to 11 U.S.C. § 547(b).

IT IS FURTHER, BY THE COURT, ORDERED That the trustee's request for prejudgment interest shall be and the same is hereby DENIED.

This Memorandum shall constitute my findings of fact and conclusions of law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure.